[No. A077145. First Dist., Div. Four. July 16, 1998.]

In re the Marriage of JACK and CAROL ROSEVEAR.
JACK ROSEVEAR, Respondent, v.
CAROL ROSEVEAR, Appellant.

## COUNSEL

Clark H. Summers, Jr., for Appellant.

Hunt, Oliver & Berkov and Mauna Berkov for Respondent.

## OPINION

**McGUINESS, J.**—Carol Rosevear appeals from an order granting respondent Jack Rosevear's motion pursuant to Code of Civil Procedure section 664.6 for entry of judgment by stipulation, and denying her motion pursuant to Code of Civil Procedure section 473 and Family Code[1] section 2120 to set aside the same judgment. Carol[2] contends the trial court abused its discretion in refusing to grant her motion to set aside the stipulated judgment. We affirm the trial court's order and entry of judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The parties separated on November 29, 1993. Jack filed a petition for dissolution of his marriage with Carol on January 28, 1994. Carol and the parties' children continued to live at the family home in Novato. After separation, Jack continued to pay for most of the household expenses, including the mortgage on the family residence, utilities, telephone, and groceries. Because most of his income was going to pay these expenses, Jack could not afford a residence of his own, and so lived with his mother for the first year of separation.

---

[1] Unless otherwise indicated, all further statutory references are to the Family Code.

[2] For ease of reference, in this opinion we refer to the parties by their first names. (See *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475-476, fn. 1 [274 Cal.Rptr. 911].)

During most of the parties' 12-year marriage, Jack was employed by the County of Marin Fire Department as a firefighter. In 1994, Jack's gross annual income was between $65,000 and $70,000, including both his salary from firefighting and from Rosevear Private Investigations, his part-time private investigation business. The property at issue in the dissolution consisted of the family residence in Novato, Jack's pension, Rosevear Private Investigations, a brokerage account with Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), a recreation vehicle (the RV), household furniture and furnishings, and a truck. According to Jack, both the family residence and the RV were separate property owned in equal one-fifth shares by Jack and the parties' four children, pursuant to inheritance. In the course of settlement negotiations, the parties agreed that the pension, the Merrill Lynch account, the household furniture and furnishings, and the truck were all community property.[3] In addition, Carol had an undisputed separate property interest in oil wells through a business entity identified as "Royal Arcadia," and premarital and postseparation earnings, gifts and accumulations.

Carol was unrepresented by counsel for over one year from the filing of Jack's petition for dissolution in January 1994 until February 1995. In February 1994, Jack's attorney, John Grey, sent Carol a written offer of settlement, offered to draft a marital settlement agreement if the terms of the proposal were acceptable, and urged Carol to consult an attorney. When

---

[3]Carol has filed a motion for judicial notice of portions of her writ of error coram vobis, *Rosevear v. Superior Court* (A079377) in this court. We previously ordered that the motion for judicial notice be considered with the merits of Carol's appeal. In the motion, Carol asserts for the first time that during probate proceedings subsequent to the trial court decision on appeal in this case, evidence was adduced suggesting that Jack misrepresented the Merrill Lynch account to Carol as community property, when in fact it was the repository of separate property funds belonging to Jack and the parties' children. Pursuant to Evidence Code section 452, dealing with permissive judicial notice of court records, Carol now asks us to take judicial notice of *portions* of the record filed with her previous writ of error coram vobis, containing *allegations* by her attorney about the record in the probate proceeding. We denied the petition itself on September 19, 1997 (nonpub. opn).

We decline to grant Carol's motion for judicial notice of this material. The "evidence" of which Carol asks us to take judicial notice is far too fragmentary to be of any use on this appeal. In its entirety, it consists of (a) *allegations* by Carol's *own attorney* concerning the probate proceedings, as contained in Carol's pleadings on the writ; and (b) three pages of reporter's transcript, also containing arguments and allegations by Carol's attorney. All of these statements concern matters *not before* the trial court in the matter on appeal in this case. It is apparent that Carol is trying to substantially alter some of her key arguments in this appeal by asserting that the stipulated judgment should be set aside on grounds of fraud and perjury. Neither of these grounds was argued or presented to the trial court, and neither is mentioned in any of the briefs on this appeal. We decline to consider this argument de novo on appeal, particularly on the basis of the scanty record of which Carol now asks us to take judicial notice, culled from a writ petition we have previously denied. The motion is therefore denied.

Carol did not respond, Grey wrote her in June and August 1994, again asking her to review the proposal in consultation with an attorney. In his letter of August 10, 1994, Grey stated: "As you know, your husband has been making voluntary support payments that are, in my opinion, well in excess of those that would be ordered by the court. We need to enter into a stipulation regarding support that would establish the voluntary support in a way that would be mutually beneficial to you for tax purposes." On November 3, 1994, Grey served Carol with a preliminary declaration of disclosure, setting out Jack's income and expense declaration, schedule of assets and debts, and copies of tax statements, pay receipts, and credit union statements. Carol did not file a preliminary declaration of disclosure. On December 7, 1994, February 3, 1995, and February 16, 1995, Grey sent Carol a series of proposed drafts for a marital settlement agreement (MSA) between the parties, based on informal, tentative discussions between the parties. Each time, Grey urged Carol to obtain legal advice, and stated his understanding that Carol would submit the MSA for review by an attorney of her own.

In February 1995, Carol retained Attorney Sarah Friesendorf to represent her. Although Carol thought the proposed MSA was "fairly satisfactory," and that it "left [her] in a position [in which she] would not have been nearly so vulnerable financially and would have had some control over the financial affairs of the children," Friesendorf told Carol that "the arrangement was a terrible one" for her, and that "she could do much better . . . ." On February 27, 1995, Grey wrote Friesendorf to acknowledge her representation of Carol. Grey asked Friesendorf for her comments on the proposed MSA and for Carol's preliminary declaration of disclosure, and stated his desire to arrange a meeting to discuss settlement. Thereafter, Friesendorf rejected the proposed MSA on behalf of Carol. In response, on March 14, 1995, Grey removed all previous proposals for settlement and again requested Carol's preliminary declaration of disclosure.

On March 15, 1995, Friesendorf wrote Grey requesting informal discovery from Jack of documents relating to the parties' previous sale of a residence, expenditures by Jack in connection with the probate of his parents' estate, escrow documents and records relating to the purchase of the family residence, Jack's last three paycheck vouchers, and information on his medical and pension plans. On March 17, 1995, Jack responded to Friesendorf's request for informal discovery by providing copies of Jack's most recent paycheck stubs, a copy of the June 1994 statement for Jack's pension, and statistical data to enable Friesendorf to obtain an actuarial evaluation of the pension. Grey offered to obtain a first quarter financial statement for Jack's personal business prepared by an accountant. With

regard to the rest of the requested documentation, Grey told Friesendorf that it was located at the family residence where Carol was living, and if they had difficulty locating the documents, Jack would come to the house at a prearranged time to help them find them.

In several letters between March and June 1995, Friesendorf complained to Grey that Jack was not paying Carol's support or household expenses. In response, Grey sent Friesendorf a series of letters offering to meet and agree on reasonable levels of support and exchange of documents, and making specific proposals with regard to paying support in accordance with applicable guidelines. Jack's current attorney, Mauna Berkov, associated into the case as cocounsel on May 18, 1995, to assist in dealing with custody issues between the parties. On June 5, 1995, Grey wrote Friesendorf a letter noting he had received no response to any of his proposals for temporary support. Grey wrote that he was substituting out of his representation of Jack, and formally withdrew all previous settlement proposals and offers regarding support in light of his withdrawal from the case. Thereafter, most of the time and attention of Attorneys Berkov and Friesendorf in the case was directed to settling issues of custody until the parties entered into a stipulation and order on August 31, 1995, establishing an equal "timeshare" arrangement, in which the children would rotate between their parents on a weekly basis and attend school in Jack's school district.

In August 1995, Carol fired Friesendorf and substituted herself as attorney of record. On September 5, 1995, Jack filed his bench/bar settlement conference statement, setting out his position on the parties' community and separate property, copies of his recent pay vouchers, and his own income and expense declaration. In mid-September 1995, Carol retained Charlotte Huggins as her new attorney. Huggins immediately contacted Berkov and asked for a continuance of the bench/bar settlement conference from the scheduled date on September 25, 1995. Berkov agreed to continue the settlement conference to November 13, 1995.

In October 1995, Huggins asked Berkov for informal production of documents. In response, on November 6, 1995, Berkov produced all the requested documents that were in her possession, and directed Huggins's attention to the fact that the remainder of the documents requested had either already been produced, or else were located at the family home where Carol was residing. On October 24, 1995, Huggins filed Carol's bench/bar settlement conference statement, setting forth Carol's position regarding the parties' community and separate property interests, and her proposals for the division of property and child and spousal support. Attached as an exhibit to Carol's settlement conference statement were copies of a title company

document on the 1990 escrow of the parties' previous residence in Novato and the 1994 schedule C for Jack's private investigation business. Despite the attachment of these documents to her settlement conference statement and the informal discovery that had already taken place in response to the requests of her attorneys for production of documents, Carol's settlement conference statement asserted that "[n]either party to date has made any preliminary disclosure regarding property, nor has any discovery, informal or otherwise, been exchanged." On this basis, her settlement conference statement took the position that "until this documentation is available, this case is not ready for settlement."

The bench/bar settlement conference took place on November 13, 1995, before a panel consisting of Temporary Judges Robert McCreadie, Richard Riede and Bonnie Hough. In the course of the settlement conference, which lasted the entire day, the panel made recommendations and proposals for the settlement of the case. Temporary Judge McCreadie had prepared his own support calculations prior to the settlement conference, indicating that spousal support should be $172 per month and child support $1,327 per month, for a total of $1,499 per month. In lieu of paying this amount as support, Jack agreed to pay the mortgage on the family residence, property taxes, and one-half the insurance on the property, or a total of $1,800 per month, plus the children's medical and dental insurance costs and unreimbursed medical and dental expenses. The parties agreed these amounts were in excess of what Jack's support obligation would otherwise be. In addition, the parties agreed that (a) Jack would convey his 20 percent interest in the family residence to Carol in exchange for her community interest in Jack's pension and retirement benefits and his private investigation business, (b) Jack would act as the trustee for the children's 80 percent interest in the family residence, (c) the residence would be listed for sale in January 1997, (d) Carol would keep the parties' Merrill Lynch account, and (e) Jack's obligation to pay spousal support would "terminate[] irrevocably" as of June 30, 1997, or upon Carol's remarriage or death.

By the end of the settlement conference, the parties had reached agreement on all outstanding issues. The settlement agreement was read into the record in the presence of both parties, their attorneys, and all three members of the bench/bar settlement conference panel. Prior to the settlement agreement being read into the record, Temporary Judge McCreadie admonished both parties that although the settlement conference might appear "very informal," it was actually "a very important session"; told them "to listen very carefully" as the settlement agreement was read into the record; and warned them they would each be asked, under oath, whether they (a) heard

the agreement as it was read, (b) understood the terms of the agreement, (c) had sufficient time to discuss the agreement with their respective attorneys, and (d) agreed to be bound by the terms of the agreement. Temporary Judge McCreadie added: "If you answer 'yes' to all of those questions, then it will—the agreement will become the Judgment of the Court and it is over with. Tomorrow morning there is no buyer's remorse. You can't say 'Oh, my God, what did I do? I didn't understand.' So make sure you understand it. That is important."

As Attorney Berkov proceeded to read the settlement agreement into the record, Carol interrupted on several occasions with specific questions. Each time, the proceedings went off the record for discussion, after which the reading recommenced. At the end of the reading, Temporary Judge Mc-Creadie asked each party individually, under oath, whether he or she (a) heard the agreement as read into the record; (b) understood the terms of the agreement; (c) had sufficient time to discuss those terms with his or her attorney; and (d) agreed to be bound by the terms. Temporary Judge McCreadie specifically asked Carol whether she understood and agreed that she could not ask for spousal support to run past June 30, 1997. Both Carol and Jack responded affirmatively to all of these questions.

On November 28, 1995, Berkov forwarded to Huggins the original stipulated judgment for review and signatures. The stipulated judgment contained a clear statement of what the parties had agreed to, and an acknowledgment that they understood and agreed to abide by the terms of the agreement. On February 21, 1996, Huggins mailed the fully executed original stipulated judgment back to Berkov, with the signatures of both Carol and Huggins, and without any change or amendment. Jack and Berkov signed the agreement on March 13, 1996.

In May 1996, Berkov sent the original appearance, stipulation and waivers form to Huggins for execution in order to obtain a final judgment. Huggins did not respond. On July 8, 1996, Carol's present attorney, Clark H. Summers, Jr., substituted into the case. Thereafter, Carol refused to sign the appearance, stipulation and waivers form. Consequently, on July 23, 1996, Jack filed his motion to enter judgment pursuant to Code of Civil Procedure section 664.6.[4] On August 1, 1996, Carol filed her motion to set aside the stipulated judgment, under Code of Civil Procedure section 473 and section

---

[4]Code of Civil Procedure section 664.6 states: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction

2120 et seq., alleging that she had executed the stipulated judgment under the influence of duress and mistake.

The trial court heard both motions on September 10, 1996. At the conclusion of the hearing, the trial court ordered the parties to obtain a transcript of the relevant portion of the bench/bar settlement conference, with an opportunity for them to file any additional declarations or pleadings in response to the transcript, and took the matter under submission.[5] The parties filed the transcript with the court with additional declarations and pleadings.

On November 12, 1996, the trial court issued its intended decision denying Carol's motion to set aside the stipulated judgment, and granting Jack's motion for entry of judgment. The trial court stated it had "carefully reviewed the reporter's transcript of the settlement entered into before the judge pro tem and the Bench/Bar panelists on November 13, 1995," and found that Carol "was represented by competent counsel at the . . . settlement conference, and was properly voir dired by Judge Pro Tem Robert Bennett McCreadie before the parties' settlement was approved and entered by the Court."

On November 15, 1996, Carol filed a notice of intention to file objections to the intended decision pursuant to rule 232 of the California Rules of Court. On November 19, 1996, Jack filed opposition, stating that Carol's objections were untimely under the specified California court rule because she had never filed a timely request for a statement of decision. On December 13, 1996, the trial court denied Carol's request for a statement of decision. The trial court entered judgment for Jack, and this appeal timely followed.

## II. STANDARD OF REVIEW

On appeal, Carol contends the trial court erred in denying her motion under section 2120 et seq., to set aside the stipulated judgment. She

---

over the parties to enforce the settlement until performance in full of the terms of the settlement."

[5]At the hearing, the trial court made the following remarks to counsel before ordering a transcript of Temporary Judge McCreadie's voir dire of Carol: "The thing that bothers me the most is that . . . as far as [Carol's] side of the case goes, . . . not only was she represented, but it was a settlement conference of long duration, and she entered into this agreement, and was voir dired by the court. [¶] I mean, sometimes people after entering into settlements or selling property get what's known as 'buyer's or seller's remorse,' and want to essentially set the matter aside thinking that maybe they didn't get as good a deal as they have. [¶] But she has quite a burden on her because of the way the settlement was entered into."

argues that "the essential facts are undisputed" or "uncontradicted," and the case therefore presents a "pure question of law" of first impression on the interpretation of the applicable Family Code provisions, suitable for "independent appellate review" by this court.[6] In addition, or alternatively, she argues that the trial court abused its discretion in refusing to grant her motion to set aside the stipulated judgment. Carol's contentions are without merit.

Generally, where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment of the proper decision for that of the trial judge. The trial court's exercise of discretion will not be disturbed on appeal in the absence of a clear showing of abuse, resulting in injury sufficiently grave as to amount to a manifest miscarriage of justice. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58]; *Jessup Farms* v. *Baldwin* (1983) 33 Cal.3d 639, 650-651, fn. 7 [190 Cal.Rptr. 355, 660 P.2d 813]; *San Bernardino City Unified School Dist.* v. *Superior Court* (1987) 190 Cal.App.3d 233, 241 [235 Cal.Rptr. 356]; *Brown* v. *Newby* (1940) 39 Cal.App.2d 615, 618 [103 P.2d 1018]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 356, pp. 404-405.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*Walker* v. *Superior Court* (1991) 53 Cal.3d 257, 272 [279 Cal.Rptr. 576, 807 P.2d 418]; *Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 478-479 [243 Cal.Rptr. 902, 749 P.2d 339]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1995) ¶¶ 8:87-8:87.1.) The burden is on the complaining party to establish abuse of discretion. (*Blank* v. *Kirwan, supra,* 39 Cal.3d at p. 331; *Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) The showing on appeal is insufficient if it presents a state of facts which simply affords an opportunity for a difference of opinion. (*In re Marriage of Varner* (1997) 55 Cal.App.4th 128, 138 [63 Cal.Rptr.2d 894]; *People* v. *Stewart* (1985) 171 Cal.App.3d 59, 65 [215 Cal.Rptr. 716].)

Of course, the discretion of a trial court is not an uncontrolled power. A proper exercise of judicial discretion requires the exercise of discriminating

---

[6]Carol claims the "evidence on the issue of duress by reason of the coercion by her own attorney Huggins was uncontradicted," and "[b]ecause this evidence was uncontradicted, there is no factual dispute to be resolved . . . ." She also asserts that the "evidence on the issue of mistake occasioned by the manifest failure of both of her attorneys to investigate and prepare her case for settlement or trial[,] their failure to educate her as to the facts and law of her case," and the "complete absence of any competent knowledge upon which to base a decision caused by the neglect of both former counsel," is "likewise uncontradicted." As we will discuss, Carol is incorrect. There is ample conflicting evidence in the record on her claims of both duress and mistake.

judgment within the bounds of reason, and an absence of arbitrary determination, capricious disposition, or whimsical thinking. A court must know and consider all the material facts and legal principles essential to an informed, intelligent, and just decision in the particular case before it. (*Carroll* v. *Abbott Laboratories, Inc.* (1982) 32 Cal.3d 892, 897 [187 Cal.Rptr. 592, 654 P.2d 775]; *People* v. *Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65]; *In re Cortez* (1971) 6 Cal.3d 78, 85-86 [98 Cal.Rptr. 307, 490 P.2d 819]; *Gossman* v. *Gossman* (1942) 52 Cal.App.2d 184, 195 [126 P.2d 178]; 9 Witkin, Cal. Procedure, *supra,* Appeal, § 358, pp. 406-408.) "Discretion is abused in the legal sense ' "whenever it may be fairly said that in its exercise the court . . . contravened the uncontradicted evidence." ' [Citations.]" (*Salowitz Organization, Inc.* v. *Traditional Industries, Inc.* (1990) 219 Cal.App.3d 797, 806 [268 Cal.Rptr. 493].)

### III. RELIEF FROM DISSOLUTION JUDGMENT

 Carol's motion to set aside the judgment was filed under sections of the Family Code providing for relief from judgment in marital dissolution cases where the division of property or the award of support "is inequitable . . . due to the nondisclosure or other misconduct of one of the parties."[7] (§ 2120, subd. (b).) The Legislative findings and declarations promulgated in connection with these recently enacted provisions (Stats. 1993, ch. 219, § 108) state that "[t]he public policy of assuring finality of judgments must be balanced against the public interest in ensuring proper division of marital property, in ensuring sufficient support awards, and in deterring misconduct." (§ 2120, subd. (c).)[8] To this end, section 2121, subdivision (a), provides: "In proceedings for dissolution of marriage, for nullity of marriage, or for legal separation of the parties, the court may, on any terms that

---

[7] In this instance, Carol's motion to set aside the stipulated judgment was filed prematurely, since no judgment had been entered. In taking Carol's motion under submission, the trial court impliedly construed the relief requested as being within the broad remedial purposes of section 2120 et seq., and expressly treated the motion as one for relief from the stipulated judgment that the parties entered into following the bench/bar settlement conference. The trial court was well within its discretion in doing so.

[8] Section 2120 provides: "The Legislature finds and declares the following:

"(a) The State of California has a strong policy of ensuring the division of community and quasi-community property in the dissolution of a marriage as set forth in Division 7 (commencing with Section 2500), and of providing for fair and sufficient child and spousal support awards. These policy goals can only be implemented with full disclosure of community, quasi-community, and separate assets, liabilities, income, and expenses, as provided in Chapter 9 (commencing with Section 2100), and decisions freely and knowingly made.

"(b) It occasionally happens that the division of property or the award of support, whether made as a result of agreement or trial, is inequitable when made due to the nondisclosure or other misconduct of one of the parties.

"(c) The public policy of assuring finality of judgments must be balanced against the public interest in ensuring proper division of marital property, in ensuring sufficient support awards, and in deterring misconduct.

"(d) The law governing the circumstances under which a judgment can be set aside, after the time for relief under Section 473 of the Code of Civil Procedure has passed, has been the

may be just, relieve a spouse from a judgment, or any part or parts thereof, adjudicating support or division of property, after the six-month time limit of Section 473 of the Code of Civil Procedure has run, based on the grounds, and within the time limits, provided in this chapter."[9]

Section 2122 sets out the exclusive grounds and time limits for an action or motion to set aside a marital dissolution judgment. Under this section, any action or motion to set aside such a judgment must be based on actual fraud, perjury, duress, mental incapacity, or mistake.[10] Although the party seeking to set aside a dissolution judgment must also establish that the presence of at least one of these five grounds for relief "materially affected the original outcome" and that he or she "would materially benefit from the granting of the relief" (§ 2121, subd. (b)), the fact the judgment may have been inequitable to the moving party cannot *by itself* serve as a basis for setting aside that judgment. As stated by section 2123: "Notwithstanding any other provision of this chapter, or any other law, a judgment may not be set aside simply because the court finds that it was inequitable when made, nor simply because subsequent circumstances caused the division of assets or liabilities to become inequitable, or the support to become inadequate."

Thus, in order to set aside the stipulated judgment in this case, Carol was required to establish one of the five grounds specifically enumerated in

subject of considerable confusion which has led to increased litigation and unpredictable and inconsistent decisions at the trial and appellate levels."

[9]Subdivision (b) of section 2121 in turn provides: "In all proceedings under this chapter, before granting relief, the court shall find that the facts alleged as the grounds for relief materially affected the original outcome and that the moving party would materially benefit from the granting of the relief."

[10]Section 2122 provides: "The grounds and time limits for a motion to set aside a judgment, or any part or parts thereof, are governed by this section and shall be one of the following:

"(a) Actual fraud where the defrauded party was kept in ignorance or in some other manner, other than his or her own lack of care or attention, was fraudulently prevented from fully participating in the proceeding. An action or motion based on fraud shall be brought within one year after the date on which the complaining party either did discover, or should have discovered, the fraud.

"(b) Perjury. An action or motion based on perjury in the preliminary or final declaration of disclosure or in the current income and expense statement shall be brought within one year after the date on which the complaining party either did discover, or should have discovered, the perjury.

"(c) Duress. An action or motion based upon duress shall be brought within two years after the date of entry of judgment.

"(d) Mental incapacity. An action or motion based on mental incapacity shall be brought within two years after the date of entry of judgment.

"(e) As to stipulated or uncontested judgments or that part of a judgment stipulated to by the parties, mistake, either mutual or unilateral, whether mistake of law or mistake of fact. An action or motion based on mistake shall be brought within one year after the date of entry of judgment."

section 2122, and that she would materially benefit from the granting of relief. Both here and in the trial court, she has argued that the stipulated judgment should be set aside on grounds of mistake or duress.

Contrary to Carol's assertion, the facts regarding her claims of mistake and duress are not undisputed. With regard to the claim of "mistake," the record shows that prior to the settlement conference, Jack provided Carol with substantial economic documentation, informed both her attorneys that more such documentation was located at the family residence, and offered to assist Carol in locating those documents. The transcript of the voir dire at the settlement conference indicates that Carol understood the terms of the settlement at the time she agreed to it. The fact she signed the stipulated judgment itself on February 21, 1996, over *three months* after she placed her oral agreement to the settlement agreement on the record at the settlement conference, is very strong evidence contradicting any inference of possible mistake on her part about the terms of the stipulation.

Moreover, the entire premise of Carol's claim of mistake is that the property division and support arrangements to which she agreed at the bench/bar settlement conference were inequitable to her, and but for her "mistake" about the true nature of her economic position she would not have stipulated to these arrangements. Carol has failed to establish the essential premise for this claim of material mistake in that she has not shown that the property division and support arrangements were in fact inequitable. To the contrary, Jack offered substantial evidence that the agreed-upon division of the relatively small community estate was fair to both parties. Temporary Judge McCreadie himself calculated a proposed level of support that was substantially less than that which Jack actually agreed to pay. In short, even if Carol misunderstood the terms of the stipulated judgment, it is far from undisputed that those terms were unfair and inequitable to her.[11]

With regard to Carol's claim of duress, again the evidence is not undisputed. The transcript of Temporary Judge McCreadie's voir dire at the settlement conference contains no hint of coercion or duress. To the contrary, Temporary Judge McCreadie took extraordinary pains to ensure that

---

[11]Under section 2123, a trial court may not set aside a dissolution judgment on the *sole* grounds the judgment is inequitable or the support ordered is inadequate. As discussed, a party seeking to set aside a dissolution judgment must first establish the existence of at least one of the five exclusive grounds for relief enumerated in section 2122 (fraud, perjury, duress, mental incapacity, or mistake), and additionally that the presence of this element "materially affected the original outcome" in such a way "that the moving party would materially benefit from the granting of the relief," as required by section 2121, subdivision (b). In other words, the moving party must establish *both* the presence of at least one of the five factors listed in section 2122, and that this resulted in material disadvantage to the moving party. Our point here is that unless Carol was able to establish that the judgment was in fact inequitable to her, there could be nothing for her to have been mistaken about in stipulating to that judgment. Because she failed to establish that the judgment was inequitable, she also necessarily could not show any grounds for a claim of "mistake."

Carol's agreement was freely, knowingly and voluntarily given. He specifically asked her about the spousal support issue more than once. Carol was clearly and expressly given sufficient opportunity to complain or object. If she had truly felt coerced or pressured to agree at the time of the settlement conference, surely some indication would appear in the reporter's transcript. Although Carol now claims her attorney, Huggins, pressured her to agree to the stipulated judgment in unreported conversations at the settlement conference not on the record, her present assertions in this regard are once again contradicted by the fact that she signed the stipulated judgment a full three months *after* the settlement conference at which her attorney was supposedly coercing her. During that three-month period, Carol had ample time to reflect or obtain other advice about what to do. The fact that she nevertheless went ahead and signed the stipulated judgment is strong evidence that what she was experiencing was not duress, but "buyer's remorse."

Because there is substantial conflicting evidence on the central issues to Carol's motion, independent appellate review of these questions is inappropriate and unwarranted. Review must therefore be on the basis of abuse of discretion. There was clearly no abuse of discretion in this case. The transcript of the careful voir dire at the settlement conference, the fact the settlement conference lasted an entire day, Carol's execution of the stipulated judgment a full three months later, and her representation by counsel before, during and after the conference, all provide strong evidence in support of the trial court's conclusion that Carol failed to establish either mistake or duress. On this record, it would have been inappropriate for the trial court to have set aside the stipulated judgment.

Carol's claim really boils down to an assertion that she failed to obtain an equitable division of property or support order because of the negligence of her attorneys. Section 2124 provides that "[t]he negligence of an attorney shall not be imputed to a client to bar an order setting aside a judgment, unless the court finds that the client knew, or should have known, of the attorney's negligence and unreasonably failed to protect himself or herself." In other words, a party seeking to set aside a judgment may not be *barred* from relief simply because that party's attorney was in some respect negligent. Nevertheless, even though attorney negligence will not be imputed to a client to bar an order setting aside a judgment, such an order may still only be granted if it is based on one of the five exclusive grounds specifically set forth in section 2122. Attorney negligence is not itself one of these enumerated grounds for setting aside a judgment. The fact that attorney negligence is not a *bar* to setting aside a dissolution judgment does not transform it into a form of fraud, perjury, duress, mental incapacity, mistake, or other ground *for* setting aside a judgment. Having failed to establish any one of the

exclusive statutory bases for relief from judgment, or even that the stipulated judgment was inequitable for her, Carol cannot now rely on section 2124 to set aside that judgment.

## IV. DISPOSITION

The judgment is affirmed. Each party shall pay his or her own costs on appeal.

Hanlon, P. J., and Reardon, J., concurred.